German A. BARRERA, Appellant,

v.

UNITED STATES of America, Appellee.

No. 90–1172.

District of Columbia Court of Appeals.

Argued Sept. 12, 1991.

Decided Nov. 27, 1991.

---

**1122**

George A. Fisher, Washington, D.C., appointed by this court, for appellant.

Robert A. De La Cruz, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas C. Black, and Patricia Stewart, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before FERREN, SCHWELB, and FARRELL, Associate Judges.

FERREN, Associate Judge:

A jury convicted appellant of committing an indecent act with a child under the age of 16 years, D.C.Code § 22–3501 (1989), and of one count each of oral and anal sodomy, *id.* § 22–3502. Appellant claims six trial court errors: (1) failure to grant his motion for judgment of acquittal at the close of all evidence; (2) abuse of discretion in denying his motion for either a mental evaluation of the ten year old complaining witness or an authorization to inspect the child's school records; (3) inadequacy of the standard jury instruction dealing with child witnesses; (4) failure to suppress impeaching statements appellant made to the police before being informed of his *Miranda* rights; (5) plain error in permitting the use of hearsay testimony about the complaining witness's delayed report of the sexual assault; and (6) allowing the government to present improper rebuttal testimony intended to show the bias of appellant's wife who testified on his behalf. We find no reversible error on five of the questions presented but must remand the case for further findings on the fourth issue: the suppression motion.

## I.

On the evening of July 4, 1989, nine-year-old Milton Shephard, a special education student, told his friend, Alex Ortiz, that the appellant German Barrera, a neighbor who lived in the same apartment building, had sexually assaulted him the night before. The two boys reported the incident to Milton's sister's fiance. He went with the children to tell Milton's father, who in turn called the police. Detective Caesar Casiano responded to the call. Milton told Detective Casiano that Barrera had promised him a fish to come upstairs to Barrera's apartment and that he had bitten Barrera's penis at some point during the assault. Milton identified Barrera as his attacker, first by name and then by pointing to him when Barrera was outside the apartment building. At that point Detective Casiano told Barrera that he had been accused of a sexual assault and that the police wanted to talk with him at police headquarters.

Barrera agreed. Pursuant to internal police regulations, Detective Casiano then notified the sex crimes unit about the alleged assault.

Soon thereafter, the police placed Barrera in handcuffs, drove him to police headquarters, and took him into an interviewing room. After removing one handcuff, Detective Casiano again spoke briefly to Barrera about the alleged assault. Sometime later, Casiano asked to check Barrera's genitals for evidence of the alleged bite. Barrera agreed to the inspection, which showed no marks. After interviewing Milton Shephard, Detective Diana Rodriguez of the sex crimes unit came to the interviewing room to interrogate Barrera. At that time, neither Rodriguez nor Casiano had yet read Barrera his *Miranda*[1] rights. Detective Rodriguez asked whether Milton had been in Barrera's apartment the day before, and Barrera responded "yes." She then asked whether Barrera knew what had happened, and he replied that he had been drinking and did not know or could not recall. Detective Rodriguez did not write down the exact words of the brief exchange and did not make an audio or video recording. No one else was present. Detective Casiano then reentered the room, informed Barrera that he was under arrest, and asked him to fill out and sign a "rights card" in Spanish. At that point, Barrera indicated that he did not wish to talk any further.

After talking with Detective Rodriguez at the police station, Milton's father accompanied Milton to Children's National Medical Center. There, Dr. Evaline Alessandrini, a pediatric resident, conducted an examination. Most of the conversation was between Dr. Alessandrini and Milton's father, with the doctor pointing to various parts of the body and asking Milton questions. Milton complained of pain around his anus and in his throat, as well as when having bowel movements and while urinating. The physical examination revealed multiple but slight abrasions of the superficial skin of the penis and an abnormal concentric abrasion pattern around the anus. At trial, Dr. Alessandrini also recalled a slight tearing around the anus, a detail she had failed to note in her written report. There was no evidence of any loss in anal muscle tone, and the complaint of a sore throat could not be confirmed.

Appellant was indicted on December 19, 1989, and charged with committing an indecent act with a child under the age of 16 and with two counts of sodomy. At a jury trial beginning May 11, 1990, the government's case relied heavily on the testimony of the complaining witness, Milton Shephard. At times his testimony was inconsistent and non-responsive to questions. For example, Milton could not recall what he had said to the police or to Dr. Alessandrini; he misstated his age and could not identify his birth date, the date of Christmas, or the day of the week; he forgot that his father, a minister, took him to church almost every day; and he provided many incomplete and inconsistent statements about basic facts of the case. Milton Shephard did, however, clearly testify that Barrera pulled him into Barrera's apartment and "pulled [Milton's] clothes off." Using two dolls, Milton demonstrated what had happened, positioning the dolls so that the pants of the "small doll" were all the way down and the pants of the "big doll" were partially down. He then stated that Barrera put "his pee-pee" in Milton's mouth, and that after Milton had bitten Barrera's penis, Barrera had put his penis into Milton's "behind." Milton further testified that Barrera had touched Milton's penis, and that after completing the assault Barrera had given him a fish to take home. When asked why he had not told anyone what had happened until the next day, Milton replied that he had been afraid his parents would "hit" him.

Three other government witnesses provided circumstantial evidence tending to support Milton Shephard's story. Milton's father, Antonio Shephard, testified that on July 3rd around 4:00 p.m. he had seen Barrera in the alley behind the apartment building with some fish, sitting around drinking with his friends. Mr. Shephard found a fish in his freezer the next day and

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See infra* note 7.

threw it out because he did not know where it had come from. Alex Ortiz, a twelve-year-old friend and neighbor of Milton's, testified that on July 4th Milton had told him about the sexual assault and that Milton had said Barrera had promised him an orange and a fish to come up to Barrera's apartment. Milton's sister's fiance, Rafael Antonio Sencion, testified that he had not seen Milton during the late afternoon and early evening of July 3rd but that he had noticed Barrera's windows were closed during that time period. Sencion had thought this was "unusual" because the day was very hot and he had not seen an air conditioning unit in the window.

For the defense, Dr. William Brownlee testified that there was no medical evidence of oral sodomy, that the superficial abrasions on the penis were consistent with dry skin and lack of cleanliness, and that the abnormal concentric abrasion pattern around the anus, considered in conjunction with normal anal muscle tone, was inconsistent with penetration required for anal sodomy. Dr. Brownlee also stated that his examination of Barrera's genitals showed no evidence of a bite.

Four of Barrera's friends testified that they had gone fishing with him during the afternoon and early evening of July 3rd and that the five of them had not returned until sometime around 9:00 p.m. Upon returning to Barrera's apartment building, they stood around outside in the alley for about twenty minutes and drank two beers each before departing. Silvia Salmeron, Barrera's wife, testified that Milton Shephard had not been in their apartment on the afternoon or evening of July 3rd. She said that she had returned home from work that day around 5:00 p.m., had gone out briefly to the supermarket, and had returned again by 6:30. She added that she and her two children did not leave the apartment until sometime the next day.

She also testified that their apartment had a window unit air conditioner.

Barrera took the stand and testified that his friends had arrived at his apartment around 2:00 p.m. on July 3rd and that they had decided to go fishing. They did not return until after it was dark, whereupon they talked together for ten or twenty minutes in the alley behind the building and he drank not more than two beers. When he got back to his apartment, he said, his son was watching television and his wife was sleeping in the bedroom. Barrera denied that Milton had been in his apartment that day.

The jury found Barrera guilty of all three charges, and the court sentenced him to concurrent prison terms of two-and-a-half years to seven-and-a-half years for each offense. He filed a timely notice of appeal.

## II.

 Barrera contends, first, that the trial court erred in denying his motion for judgment of acquittal at the close of all the evidence.[2] The trial court is obliged to grant such a motion if, but only if, the evidence "is such that a reasonable juror *must* have a reasonable doubt as to the existence of any of the essential elements of the crime." *Curry v. United States,* 520 A.2d 255, 263 (D.C.App.1987) (citing *Austin v. United States,* 127 U.S.App.D.C. 180, 189, 382 F.2d 129, 138 (1967)). In reviewing for insufficiency, this court applies the same standard the trial court uses. *See id.* In so doing, we conclude the trial court did not err in allowing the case to go to the jury; the evidence was sufficient for conviction.

 At trial, Milton Shephard testified that Barrera placed his penis in Milton's mouth and anus and had fondled Milton's penis. That testimony alone is sufficient

2. At the close of the government's case-in-chief, defense counsel moved for judgment of acquittal with respect to the charge of anal sodomy, arguing that the evidence was insufficient to show penetration. Although the motion was renewed at the close of all evidence, counsel gave no additional or specific ground. On appeal, Barrera's arguments as to why the motion was improperly denied refer to evidence encompassing each of the three charges. Because we conclude that the evidence is clearly sufficient to sustain a denial of a motion for judgment of acquittal as to all three charges, we need not decide whether Barrera adequately preserved the issue with respect to the charges of oral sodomy and indecent acts with a minor. *See Abdulshakur v. District of Columbia,* 589 A.2d 1258, 1264–65 (D.C.1991).

for convictions on all three charges, for in 1985 the Council of the District of Columbia repealed the requirement of independent corroboration of charges of sexual assault against minors.[3] *See also Gary v. United States*, 499 A.2d 815, 834 (D.C.1985) (en banc) (judicial abolition of corroboration requirement in all sex offenses regardless of sex or age of victim or perpetrator), *cert. denied*, 477 U.S. 906, 106 S.Ct. 3279, 91 L.Ed.2d 568 (1986). In effect, the 1985 law, *supra* note 3, and the evolution of decisions in this court eliminated a presumption that a child complaining of a sexual assault is fabricating the story unless there is corroborating evidence. Today, we leave it to the jury to consider a child's testimony along with all the other evidence. As is true with any witness, a child's testimony at times may be inconsistent or confused; and just as with any witness, such confusion or inconsistency will weigh in the jury's determination of credibility. In this case, we believe a reasonable juror could have credited Milton's testimony regardless of defense counsel's efforts to discredit it and "might or might not have a reasonable doubt as to the guilt of the accused." *Curry*, 520 A.2d at 263.

▆▆ Even if we assume some doubt about the sufficiency of Milton Shephard's testimony, Dr. Alessandrini's medical testimony established injuries consistent with an indecent act (fondling of the penis) and with anal sodomy. Barrera argues, based on the testimony of his medical expert, Dr. Brownlee, that the injuries around Milton's anus were inconsistent with anal penetration because the muscle tone of the anus was normal at the time of examination. Dr. Alessandrini's testimony for the government, however, contested Dr.

Brownlee's conclusion. Thus, the jury was left to compare and evaluate the testimony of two qualified experts.[4]

▆▆ The government, moreover, presented additional circumstantial evidence corroborating Milton's testimony. For example, Alex Ortiz testified that Milton told him about the incident; Milton's father testified that he saw Barrera at the apartment building around the time the assault took place and that he found an unknown fish in his freezer; and Mr. Sencion testified that the windows of the Barreras' apartment were closed during the hot afternoon and that this seemed unusual. Even though the defense attempted to discredit and rebut this circumstantial evidence, it was up to the jury to weigh the conflicting evidence and draw or refuse to draw any inferences that may or may not have supported Milton's own testimony. When viewed in the light most favorable to the government, our standard of review, the government's evidence was clearly sufficient for the trial court to deny Barrera's motion for judgment of acquittal.

### III.

Barrera next challenges Milton Shephard's competency to testify at trial. He argues that: (1) the trial court abused its discretion by failing to order a pretrial competency examination of the child; (2) in the alternative, the court should have granted authorization for Barrera's counsel to examine Milton's school records; and (3) the court's jury instruction about the child witness's testimony was insufficient to protect Barrera against undue prejudice from that testimony. We conclude that the trial court did not abuse its discretion by not ordering a competency examination or dis-

---

3. "For purposes of prosecutions brought under Title 22 of the D.C.Code [criminal offenses including indecent acts with children and sodomy] independent corroboration of a child victim is not required to warrant a conviction." D.C.Code § 23–114 (1989) (Child Abuse Reform Act). Before 1985, this court often faced the difficult task of determining how much independent corroboration was enough in cases of sexual assault of children. *See, e.g., Hall v. United States*, 400 A.2d 1063, 1065 (D.C.1979) (weighing various factors such as victim's age and motives to falsify in determining what quantity and weight of corroborative testimony

were required); *Banton v. United States*, 411 A.2d 975, 978 (D.C.1980) (listing circumstantial factors that could corroborate complainant's testimony).

4. The District of Columbia's sodomy statute states that "[a]ny penetration, however slight, is sufficient to complete the crime [of sodomy]. Proof of emission shall not be necessary." D.C.Code § 22–3502(b) (1989). Thus, any evidence tending to show the slightest penetration of the anus is sufficient to require denial of a motion for judgment of acquittal. *See generally* 70A Am.Jur.2d *Sodomy* § 23 (1987).

closure of private records. Although the trial court in this case had an ongoing duty to monitor and evaluate Milton Shephard's testimony, his incomplete and inconsistent statements before the jury only raised issues of credibility, not competency to testify. Furthermore, the court's reading of the standard jury instruction on child witnesses adequately protected against prejudice.

■■ A trial court has broad discretion to rule on the competency of witnesses. The decision whether a psychiatric examination is necessary for determining competency to testify at trial is a sensitive issue best left to the trial judge on the scene rather than to a distant reviewer of the record. *See Collins v. United States*, 491 A.2d 480, 484 (D.C.1985), *cert. denied sub nom. Best v. United States*, 475 U.S. 1124, 106 S.Ct. 1646, 90 L.Ed.2d 190 (1986); *Rogers v. United States*, 419 A.2d 977, 980 (D.C.App.1980). The trial judge's decision "should not be disturbed unless plainly deficient." *Vereen v. United States*, 587 A.2d 456, 457 (D.C.App.1991). The dangers that a court-ordered mental examination may frighten, harass, or deter a witness from testifying, or impinge upon a witness's right to privacy, have led to a strong presumption against such judicial compulsion. *See Collins*, 491 A.2d at 484; *Hilton v. United States*, 435 A.2d 383, 387 (D.C.App.1981); *Rogers*, 419 A.2d at 980. These dangers are especially present when a trial court is dealing with the victim of a sexual assault.

■■ "In assessing the competency of a witness, a trial judge must evaluate the [witness's] ability to accurately perceive, recall, and relate purported facts, as well as testify truthfully." *Vereen*, 587 A.2d at 457. Here, the trial judge used his authority, short of ordering a psychiatric examination, to assure that he could make a satisfactory competency determination. Before trial, the judge placed Milton Shephard on the stand for purposes of voir dire. On both direct and cross-examination, Milton

demonstrated that he understood the difference between the truth and a lie. Because the trial judge concluded that it would not be appropriate to ask Milton questions during voir dire about "purported facts" of the case, *id.*, the judge assumed an ongoing duty to evaluate Milton's perceptions, recall, and testimony for signs of incompetency.

■■ There is no indication of record that defense counsel specifically requested the court to reconsider Milton's competency during trial. On cross-examination, however, counsel demonstrated inconsistencies in Milton's testimony and pointed out gaps in his memory and knowledge. This was all accomplished in front of the jury. By arguing that those inconsistencies and gaps rendered Milton incompetent as a witness, Barrera confuses the court's legal determination of competency with the jury's factual determination of credibility. As we have recently stated: "Although competency and credibility are related, the former concerns basic, prerequisite capabilities necessary to give testimony, whereas the latter is largely a concern of the factfinders—to decide whom and what to believe." *Id.* at 458; *see Robinson v. United States*, 357 A.2d 412, 416 (D.C.1976) (weight to be given testimony of complainant in indecent liberties case is matter for jury). We do not find any basis for concluding that the court abused its discretion in failing to perceive and rule that Milton's testimony was so confused as to suggest he was incompetent. That testimony was well within the range of the jury's proper scrutiny.

■■ The trial court also did not abuse its discretion in denying Barrera's alternative pretrial request to examine Milton Shephard's private school records. We have stated before that such an extreme step may not be taken "without a compelling and detailed demonstration of need." *Davis v. United States*, 315 A.2d 157, 162 (D.C.1974).[5] Defense counsel did not argue to the trial court the relevance of Milton's

---

5. Typically, when a defendant asks to see private school or medical records, the government has had access to those records and the defendant is attempting to discover what the government has in its possession. In those situations,

a prudent trial judge, balancing the rights of the accused with the privacy rights of the witness, will usually conduct an *in camera* inspection of the records to determine what is and is not

performance, developmental progress, or behavior at school to his ability to testify at trial or to the charges and issues in this case. Although counsel alluded to past "inappropriate behavior," such vague references fall far short of a "detailed demonstration of need." *Id.*

■ During the pretrial hearing, defense counsel stated that her "only concern is why he is placed in a special education class." The type of education Milton was receiving, however, had no apparent material bearing on his competency to testify. Simply because a child is classified for educational purposes as developmentally delayed does not mean he or she is likely to be incompetent to testify. We conclude that any possible prejudice to Barrera arising from the ten year old complaining witness's testimony was adequately avoided by the pretrial voir dire examination requested by defense counsel, as well as by the court's cautionary jury instruction.[6]

### IV.

Barrera argues that statements he made in response to questions Detective Rodriguez asked before informing him of his constitutional and statutory rights should have been excluded from trial for all purposes.[7] More specifically, Barrera made two statements the government later used to impeach his testimony at trial: an inculpatory statement that Milton Shephard had been in Barrera's apartment on the date of the assault, and an arguably exculpatory statement that Barrera "had been drinking and could not recall what took place."[8]

---

relevant to the case. Unlike those situations, the government here did not have (or want) access to Milton Shephard's school records, and defense counsel did not even request judicial inspection.

6. Trial courts typically give a special jury instruction regarding the testimony of children. The trial court in this case gave such an instruction:

With respect to the testimony of the complaining witness ... Milton Shephard, the Court instructs you that a child is not disqualified as a witness merely by reason of his youth. There is no precise age which determines the competency of a child to testify. This depends upon the capacity and intelligence of the child, his understanding of the difference between truth and falsehood and his appreciation of his duty to tell the truth.

Children may not have a full understanding of the serious consequences of the charges they make or the testimony they give. You should, therefore, consider the capacity of a child witness to distinguish the truth from falsehood and to appreciate the seriousness of his testimony in evaluating his testimony.

As in the case of all other witnesses, you alone are the sole judges of the credibility of the child who has testified in this case, or the children who have testified here. In weighing the testimony of such children, you may consider not only their age, but their demeanor on the stand, their manner of testifying, their capacity to observe facts, their capacity to understand questions that were put to them and to answer questions intelligently.

You may consider whether the child impressed you as having an accurate memory and recollection, whether the child impressed you as a truth-telling person, and any other facts and circumstances bearing upon the credibility of any child witness.

You should give the testimony of a child witness such weight as, in your judgment, you believe it is fairly entitled to receive.

We disagree with Barrera's contention that the above instruction was inadequate "given the unique circumstances of this case." He argues that because the only corroborating evidence of the sexual assault was circumstantial, and because the child had difficulty while testifying, the judge was required to give a different instruction specifically focusing on children as complaining witnesses in sexual assault cases. We conclude that the judge's detailed, balanced, cautionary instruction fully informed the jury and protected Barrera's rights as a criminal defendant.

7. The government conceded before trial that Detective Rodriguez's questioning violated Barrera's constitutional rights under *Miranda, supra* note 1, because the questioning took place during custodial interrogation well after the police had probable cause to arrest. Barrera's answers to those questions were therefore excluded from the government's case-in-chief.

8. At the suppression hearing Detective Rodriguez's testimony included the following statements:

A: As far as I can recall, I asked him if he knew the boy. He said yes he did. I asked him how he knew him. He said he lived in the building. I asked him if the little boy had been in his apartment. He said yes.

 . . . .

A: Then I asked him ... could he tell me what took place in the apartment and he said he had been drinking and could not recall.

After the suppression hearing was concluded, Barrera testified in his own defense:

A: [Detective Rodriguez] asked me if I knew what happened, if I remember what happened, and I said no, I didn't know.

Barrera makes two principal arguments why the trial court erred in allowing each of these impeaching statements at trial: (1) the statements were the product of abusive tactics by the police, who took advantage of an "uneducated and unsophisticated alien resident" by deliberately eliciting incriminating statements; and (2) the statements were elicited in violation of Barrera's right to an interpreter under D.C.Code § 31–2702(e) (1988) (part of the "Interpreters for Hearing–Impaired and Non–English Speaking Persons Act of 1987") ("Interpreter Act").

### A.

■ In *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the Supreme Court held that voluntary statements inadmissible in the prosecutor's case-in-chief because of *Miranda* violations may be used nonetheless to impeach a defendant's credibility, "provided of course that the trustworthiness of the evidence satisfies legal standards." *Harris,* 401 U.S. at

Q: Did you give her a reason why you didn't know what happened?
A: They—they told me that something happened to the boy. I hadn't seen him but they had taken me because of the boy.
On cross-examination, the prosecutor asked the following series of questions:
Q: Isn't it a fact, sir, that you took Milton Shephard into your apartment on July 3rd, 1989?
A: I have never taken him into my apartment.
Q: He has never been in your apartment before, is that your testimony?
A: Not that night.
. . . .
Q: Milton Shephard went to your apartment on July 3rd because you promised him a fish, isn't that true?
A: No.
Q: And you—isn't it a fact; sir, that after Milton got in your apartment, you were so drunk you don't remember what happened that night?
A: Of course I remember, because my family was there.
Q: You remember talking to Detective Diana Rodriguez on July 4th, 1989?
A: Yes. Of course.
. . . .
Q: You remember her asking you whether or not Milton Shephard had been in your apartment on July 3rd, 1989?
A: She asked me if I knew what happened to the boy.

224, 91 S.Ct. at 645. The Court intended to prevent a defendant from turning the *Miranda* shield against illegal police methods into a license to commit perjury. *See id.* 401 U.S. at 226, 91 S.Ct. at 646. Thus, in *Harris* and related cases, statements otherwise inadmissible because of the exclusionary policy of deterring police misconduct were admitted as part of the impeachment process because they "provided valuable aid to the jury in assessing [the defendant's] credibility." *Id.* at 225, 91 S.Ct. at 645; *accord Oregon v. Hass,* 420 U.S. 714, 721–22, 95 S.Ct. 1215, 1220–21, 43 L.Ed.2d 570 (1975). The rationale is that "the inconsistency between the [defendant's] testimony and the prior statement merely [gives] the jury a means of assessing [defendant's] credibility." *Martinez v. United States,* 566 A.2d 1049, 1058 (D.C.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 685, 112 L.Ed.2d 677 (1991). For the court to admit such statements, however, the government first must show that the defendant's statements were voluntary. *See,*

Q: Do you recall her asking you whether he had been in your apartment, and your answering yes?
. . . .
A: She—she asked me if I knew what happened to the boy. I said no, I don't know what happened. If—she asked me if I remembered. I said how am I going to remember, I don't know what happened to him.
Q: Do you recall telling Detective Rodriguez that you were too drunk to remember what happened in your apartment on July 3rd?
A: I said I had something to drink, but I was not as you explained.
The interpreter: It could also mean as she explained.
Q: Is it your testimony that you did not tell Detective Rodriguez that you were too drunk to remember what happened in your apartment?
A: The question that she asked me, and I repeat this, if I knew that past night what happened to the boy—
Q: So your answer is—
A: —And I said that I did not know.
Later Detective Rodriguez testified in rebuttal:
[Barrera] was asked if he knew the boy, and he said yes. I asked him how he knew him. He said he was a neighbor. I also asked him if the boy had been in the apartment the day earlier. He said yes. I asked him if anything took place in the apartment, and he said that he had been drinking and could not recall what took place.

*e.g., New Jersey v. Portash,* 440 U.S. 450, 459, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501 (1979); *Mincey v. Arizona,* 437 U.S. 385, 401–02, 98 S.Ct. 2408, 2418, 57 L.Ed.2d 290 (1978).

At the close of the suppression hearing, the trial court ruled there was no evidence that Barrera had made the statements involuntarily; accordingly, he allowed the prosecutor to use them for purposes of impeachment and rebuttal. We agree that the record supports the court's findings that the statements were voluntary—that they were not compelled by abusive police tactics.

Although Barrera may have been handcuffed for questioning before formal arrest and had been subject to what must have been an embarrassing search of his genitals,[9] Detective Rodriguez's questioning was brief and there is no suggestion that it was overly hostile. Furthermore, Barrera acknowledges that the failure to warn him of his constitutional rights after there was probable cause for arrest could have been the result of confusion between Detective Casiano, a staff detective who initially interviewed Milton Shephard and Barrera, and Detective Rodriguez, a sex crimes unit detective, over who was in charge. Such circumstances fall short of the abuse and coercion necessary to exclude an inconsistent statement because of involuntariness. *See, e.g., Mincey,* 437 U.S. at 398–99, 98 S.Ct. at 2416–17 (defendant's statements involuntary when made while "encumbered by tubes, needles, and breathing apparatus" and complaining of "unbearable" pain); *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) (defendant's statements involuntary when made pursuant to continuous and persistent questioning for eight hours during which defendant repeatedly was denied counsel and rest).

▉ This, however, does not end our inquiry. In order to allow a prosecutor to impeach a defendant's credibility using voluntary statements taken from a defendant in violation of the Fifth Amendment, there also must be: (1) a sufficient basis to believe that those statements and any rebut-

tal testimony meet legal standards of trustworthiness, *Harris,* 401 U.S. at 225, 91 S.Ct. at 645; and (2) a reliable foundation for impeachment derived from the defendant's prior testimony on direct or cross-examination, *see, e.g., United States v. Havens,* 446 U.S. 620, 627–28, 100 S.Ct. 1912, 1916–17, 64 L.Ed.2d 559 (defendant's direct examination must reasonably suggest impeachment questions on cross-examination), *reh'g denied,* 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1172 (1980); *Ware v. United States,* 579 A.2d 701, 704 (D.C.1990) (same). This brings us to Barrera's second contention: that his statements were elicited in violation of the Interpreter Act. As elaborated below, it is appropriate to analyze Barrera's rights under that Act not only to explore the possibility of a statutory violation but also to shed light on the constitutional issue under *Harris:* the trustworthiness of Barrera's impeaching statements to Detective Rodriguez.

**B.**

▉ When a defendant's prior statement is the product of coercion, that statement is involuntary, fails the test of trustworthiness, and thus must be excluded from the impeachment process. "Trustworthiness," however, means more than just "voluntariness." As we noted in *Ibn–Tamas v. United States,* 407 A.2d 626, 641–42 (D.C.1979), the premise of the impeachment exception established by *Harris* and *Hass* is based, more broadly, on "the reliability of the impeaching statements." This is only logical: in order for a defendant's statements obtained in violation of *Miranda* to be of assistance to the jury in assessing that defendant's credibility, *see Harris,* 401 U.S. at 225, 91 S.Ct. at 645, there must be adequate assurance that those statements are in fact inconsistent with the defendant's later testimony. Otherwise, a defendant runs the risk of improper impeachment with illegally obtained prior statements that are not inconsistent. We have said that the "reliability of improperly obtained statements turns on the circumstances" under which they are giv-

---

**9.** Detective Casiano conducted the search at the request of Detective Rodriguez on the basis of the complainant's statement that he had bitten Barrera's penis.

en. *Ibn–Tamas,* 407 A.2d at 645. Police questioning of suspects who do not speak English poses a special problem of reliability, whether the procedures used are proper or not. Accordingly, to assure that any statement taken by the police from a non-English speaking person in an interrogation setting is reliable and accurate, the Council of the District of Columbia enacted the Interpreter Act of 1987.

 The statute grants to any person who does not speak English and is taken into custody and questioned by the police the unrestricted right to a qualified interpreter. D.C.Code § 31–2702(e) (1988).[10] The structure of the rest of § 31–2702 also indicates the mandatory nature of this right. In contrast with subsection (e), *supra* note 10, the language in subsections (a) (party or witness in judicial or quasi-judicial proceeding), (c) (party or witness in administrative proceeding), and (d) (witness in legislative proceeding), empowers the "appointing authority" (*e.g.,* presiding judge or commissioner) to determine whether an interpreter is necessary.[11] Subsection (b), however, which deals with counsel appointed to represent a person who does not speak English, is similar to subsection (e) in that it commands appointment of a qualified interpreter in all cases.

 The Committee Report on the Interpreter Act specifically says that police officers are not "qualified interpreters" under the Act.[12] The Interpreters for Hear-ing Impaired and Non–English Speaking Persons Act of 1987, COMM. ON GOVT. OPERATIONS, REPORT ON BILL 7–108, at 2–3 (June 11, 1987) ("COMMITTEE REPORT"). The COMMITTEE REPORT adds the Committee's finding that when police officers perform the role of interpreter, "very often these situations result in the harassment of the communication-impaired person and the inadmissibility in court of evidence gained." *Id.* at 3. The COMMITTEE REPORT stresses that "[t]he ability to act as an interpreter involves more tha[n] just language fluency." *Id.* at 2. A "qualified interpreter" is one who is "skilled in the language or form of communication needed to communicate accurately with a [person who does not speak English] and who is able to translate information to and from [that] person." *Id.; see also* D.C.Code § 31–2704 (1988) ("Preliminary determination of interpreter's qualifications"). Standards for qualified interpreters are set by the "Office of Interpreter Services." Those standards must be based on factors such as education, training, experience, and certification. *See id.* at § 31–2711. Furthermore, the Interpreter Act requires an interpreter to take an oath verifying that he or she will make "a true interpretation in an understandable manner to and for the person for whom the interpreter is appointed," *id.* at § 31–2707, and extends to the interpreter the duty of any communication privilege held by the non-English speaking person. *See id.* at § 31–2708.[13]

**10.** D.C.Code § 31–2702(e) (1988) provides:

Whenever a communication-impaired person [defined under § 31–2701(2) as a hearing-impaired person or a person who does not speak English] is arrested and taken into custody for an alleged violation of a criminal law, the officer *shall procure a qualified interpreter for any custodial interrogation, warning, notification of rights, or taking of a statement.* No person who has been arrested but who is otherwise eligible for release shall be held in custody pending arrival of an interpreter. No answer, statement, or admission, written or oral, made by a communication-impaired person in reply to a question of a law-enforcement officer in any criminal or delinquency proceeding may be used against that person unless either the answer, statement, or admission was made or elicited through a qualified interpreter and was made knowingly, voluntarily, and intelligently or, in the case of a waiver [procedure set out under § 31–2706], unless the court makes a special finding upon proof by a preponderance of the evidence that the answer, statement, or admission made by the communication-impaired person was made knowingly, voluntarily, and intelligently (emphasis added).

**11.** If, however, a person who does not speak English requests a qualified interpreter under subsections (a), (c), or (d), the appointing authority must appoint one.

**12.** There does not appear to be any statutory restriction on who may become a "qualified interpreter," so we do not foreclose the possibility that members of the Metropolitan Police Department might be able to qualify for the list of "qualified interpreters" under D.C.Code § 31–2711(b) (1988).

**13.** As the Council Committee recognized, once the police have probable cause to arrest some-

The goal of the Act is to create an independent right to an interpreter "in th[e] situation of custodial interrogation [when] *Miranda*[ ] rights and the right to due process come into effect." COMMITTEE REPORT at 3. To assure that those rights are not jeopardized, "it is essential that a qualified interpreter be used. The purpose of [§ 31–2702(e)] is to guarantee that the rights already held by [a person who does not speak English] in respect to custodial interrogation are not violated." *Id.*

■■■ To further that goal, the Interpreter Act establishes a mandatory set of procedures the police must follow for any custodial interrogation: (1) before any questioning, the police must give notice to a person who does not speak English that he or she has a right to a qualified interpreter as defined under the Act, *see* D.C.Code § 31–2703; (2) if the suspect indicates a desire for a qualified interpreter, one must be made available before any questioning, *id.* at § 31–2702(e); (3) if a suspect does not want an interpreter, the suspect must be given an opportunity to consult with his or her attorney before the police can obtain a valid waiver of the interpreter right, *id.* at § 31–2706(a); (4) if the suspect, after consulting with a lawyer, still wishes to waive the interpreter right, the suspect must execute a specific written or "orally on the record" waiver before any questioning by the police, *id.;* and (5) if a suspect does not have an attorney, the waiver of the interpreter right must be made in writing in that person's written language, *id.*

■■■ In this case, there is no question that Barrera does not speak English and the police not only failed to inform him of his rights under the Interpreter Act but also failed to follow the other mandatory statutory procedures outlined above. During the suppression hearing, defense counsel moved to exclude the statements at issue on the ground that the police had violated Barrera's statutory right to a qualified interpreter. After a brief colloquy on

the meaning of the Interpreter Act, the trial court denied the motion simply because Barrera and the interrogator, Detective Rodriguez, were both fluent in Spanish. We conclude that the trial court's understanding of the Interpreter Act was incorrect as a matter of law and thus that the court's consideration of Barrera's motion to suppress was inadequate, given the dictates of the statute.

Section 31–2702(e) unequivocally states: "No answer, statement, or admission made by a [suspect who does not speak English] in reply to a question of a law-enforcment officer ... may be used against that [person]" unless the suspect made the statement "through a qualified interpreter" or executed a valid waiver of his or her right to an interpreter. "The words used in the statute, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of [the statute]." *Simpson v. District of Columbia Office of Human Rights,* 597 A.2d 392, 399 (D.C.1991) (quotations and brackets omitted) (quoting *Riggs Nat'l Bank v. District of Columbia,* 581 A.2d 1229, 1235 (D.C.1990)). Thus it is clear, based on the ordinary meaning of the statutory language, that statements the police elicit without using a qualified interpreter or first obtaining a valid waiver may not be used in the government's case-in-chief. The government admitted this during oral argument.

The statute accordingly provides only two methods by which the police department may satisfy its statutory obligations. Moreover, under the first (interpreter) method, if a non-English speaking person makes a statement to the police through a qualified interpreter, the government still must show that the statement was made "knowingly, voluntarily, and intelligently." § 31–2702(e). Similarly, under the second (waiver) method, the statute instructs a trial court to make "a special finding upon

---

one, an interrogating police officer, even one fluent in the native language of the suspect, cannot be a qualified interpreter because a qualified interpreter must be neutral and detached. See D.C.Code § 31–2704 (interpreter qualifications); *id.* at § 31–2707 (oath of interpreter); *id.*

at § 31–2708 (privileged communications). This does not foreclose the possibility that a non-interrogating police officer unconnected with the case could become a "qualified interpreter." *See supra* note 12.

proof by a preponderance of the evidence that the answer, statement, or admission made by [the suspect] was made knowingly, voluntarily, and intelligently." *Id.*

■ But what about use for impeachment purposes of statements taken in violation of the Interpreter Act? The Act is silent on this issue. For reasons elaborated below, we decline to interpret the Act to mean that failure of the police to follow the statutory procedures necessarily requires the exclusion of impeaching statements taken in violation of the Act—as long as the objectives underlying the statutory procedures are satisfied. *Cf. Idaho v. Wright,* —— U.S. ——, 110 S.Ct. 3139, 3148, 111 L.Ed.2d 638 (1990) (while procedural safeguards for interviewing child witness enhance reliability of child's out-of-court statements, failure to follow such procedures not dispositive on admissibility of statements). Those objectives are to ensure accuracy and reliability in communications between a suspect who does not speak English and a law enforcement officer.

Other equally important criminal justice objectives limit the otherwise far-reaching mandatory language of § 31–2702(e) that "[n]o answer, statement, or admission ... may be used against that [person]." A criminal defendant's rights, whether constitutional or statutory, "cannot be construed to include the right to commit perjury." *Ware v. United States,* 579 A.2d at 703; *accord Bourn v. United States,* 567 A.2d 1312, 1315 (D.C.1989). There is no indication that the District Council intended to supplant that basic principle.[14] We there-fore believe it is appropriate to read into the Act an exception analogous to the *Harris* exception to *Miranda:* voluntary statements taken in violation of the Interpreter Act may be used to impeach a defendant, provided that there are sufficient guarantees of trustworthiness to indicate that those statements are reliable and accurate. *See Harris,* 401 U.S. at 222, 91 S.Ct. at 643.[15]

The Interpreter Act in effect supplies a statutory "standard of trustworthiness" that helps satisfy the *Harris* requirement for admitting impeachment evidence at trial that was obtained in violation of *Miranda. See* E. CLEARY, McCORMICK ON EVIDENCE § 178 at 512 (3d ed. 1984) ("The rationale for [the trustworthiness] limitation upon the impeachment exception [to the *Miranda* exclusion rule] seems to be that ... the benefits from admitting testimony for impeachment outweigh the costs only where the impeaching testimony is highly reliable."). *Any* criminal trial use of an unreliable, illegally obtained statement that does not meet legal standards of trustworthiness is a denial of due process of law. *Mincey,* 437 U.S. at 397–98, 98 S.Ct. at 2416. The Act creates a statutory presumption that any statement the police obtain in violation of the Act is untrustworthy. That presumption is irrebuttable as applied to the government's case-in-chief. Given the anti-perjury policy underlying *Harris,* however, as well as the purposes of the Interpreter Act, we conclude that the statute does not preclude the government from rebutting that presumption—solely for impeachment purposes—if

---

14. Because the goal of the Act is to further protect a defendant's rights under *Miranda,* and because *Harris* limits *Miranda's* exclusionary policy to permit government use of otherwise trustworthy statements to impeach a defendant, we do not interpret the statute's silence as indicating a legislative intent for an absolute exclusion of impeaching statements. We do recognize, however, that the Council knows how to address whether the government may or may not use a defendant's prior statements for the purposes of impeachment at a criminal trial. *See* D.C.Code § 23–1322(c)(6) (1989) (specifically addressing whether statements made in pretrial bail determination proceedings inadmissible on the issue of guilt nonetheless may be used for impeachment at trial).

15. The exception we discuss below is analogous to, though not imposed by, the one articulated in *Harris,* because it derives from a statute, the Interpreter Act, not from the Constitution. *See* E. CLEARY, McCORMICK ON EVIDENCE § 178 at 514 (3d ed. 1984) (states need not follow Supreme Court's exceptions to federal constitutional exclusionary rules when dealing with exclusionary sanctions under state law). The purpose of the Interpreter Act, ensuring trustworthiness of communication between a non-English speaking suspect and the police, is related to, but distinct from, the purpose underlying the *Miranda* exclusionary rule: to deter police misconduct that violates a suspect's Fifth Amendment rights.

it can show, by a preponderance of the evidence, that the statements at issue are reliable and trustworthy despite the fact that the police violated the Act. *See* D.C.Code § 31–2702(e).

In this case, we are not persuaded that the trial court's finding of voluntariness took adequate account of the concerns of "reliability" or "trustworthiness" underlying the Interpreter Act. The court appears to have believed that the Act was not implicated at all because appellant and Detective Rodriguez were both native speakers of Spanish. This is a misconception of the Act, and because it may have deflected the court from an appreciation of the special concerns of reliability underlying the interpreter requirement, we think the appropriate course is to remand the case for the court to reconsider the trustworthiness of the impeaching statements. *Cf. Laumer v. United States*, 409 A.2d 190, 199 (D.C.1979) (case remanded when trial court, before rejecting proffered evidence, did not have opportunity to apply standards of trustworthiness adopted later by court of appeals).

On remand the inquiry for the trial court is whether the government can show by a preponderance of the evidence that the defendant in fact made—and intended to make—the specific statements proffered, that those statements contradict the defendant's statements at trial, and that the law enforcement officer can report with reasonable accuracy those statements in rebuttal. *Cf. Idaho v. Wright*, 110 S.Ct. at 3148–49 (discussing constitutional requirement of "particularized guarantees of trustworthiness" before admitting hearsay evidence "presumptively unreliable and inadmissible"). The trial court therefore needs to examine the totality of the circumstances surrounding the non-English speaking suspect's illegally elicited statements. *Cf. Lee v. Illinois*, 476 U.S. 530, 544–46, 106 S.Ct. 2056, 2063–65, 90 L.Ed.2d 514 (1986) (determining reliability of hearsay statement from totality of circumstances surrounding making of statement). Only then can the trial court be sure whether or not the government has met its burden of showing that the impeaching statements satisfy the legal standard of trustworthiness established by the Interpreter Act. *Cf. Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980) (statement of unavailable hearsay declarant must be excluded under Confrontation Clause unless statement bears "adequate 'indicia of reliability' ").[16]

Judges SCHWELB and FARRELL decline to establish any list of subsidiary findings the trial court must make in deciding the trustworthiness issue. I, however, would go a step further. As we have done in other cases of first impression dealing with the admissibility of evidence presumed untrustworthy, "in order to give maximum guidance to the trial court," which "bears a significant responsibility under the rule we adopt," *Laumer*, 409 A.2d at 199, I set forth below various indicia of reliability that I believe the court should consider. *See, e.g., State v. Engel*, 99 N.J. 453, 493 A.2d 1217, 1225–27 (1985) (developing standards to guarantee reliability of hearsay evidence proffered at bail hearing).

### V.

I begin by reiterating that "[s]o long as we are committed to protecting [the rights of the criminally accused], inadmissibility of illegally obtained evidence must remain the rule, not the exception." *James v. Illinois*, 493 U.S. 307, 319, 110 S.Ct. 648, 655, 107 L.Ed.2d 676 (1990). The reliability factors a trial court should consider before allowing the government to use impeaching statements under the exception to the exclusionary rule of the Interpreter Act we have carved out here include: (1) the degree to which the defendant and the interrogating police officer each spoke the same language and thus understood one another's words ("communication"); (2) whether there is evidence the defendant clearly comprehended the context, meaning, and implications of the police officer's questioning ("comprehension"); (3) how well the

---

**16.** It goes almost without saying that the trial judge must be satisfied, after taking account of the translation from Spanish to English, that the impeaching statements were at least minimally inconsistent with appellant's trial testimony.

police interrogator recalls the precise words used by each party to the interrogation ("recollection"); (4) whether there is any evidence that corroborates the government's identification of the specific words used, respectively, by the police interrogator and by the non-English speaking defendant ("corroboration"); and (5) the degree of contradiction between the defendant's statements during the illegal interrogation and his testimony at trial ("inconsistency"). Although the trial court should consider these factors and any others deemed relevant, the government's failure to make a strong showing on every one need not be fatal to admissibility.

To demonstrate to the trial court and the parties the application of the above factors, I now briefly discuss them in light of the case record to date. *See Laumer*, 409 A.2d at 203–04. The trial court implicitly found that because Barrera and Detective Rodriguez are both native Spanish speakers, they were able to understand one another. As discussed above, however, the Act requires more than a finding that the interpreter and the suspect spoke a common language. Shared language fluency is probative of only the first reliability factor, communication. The second factor, comprehension, requires more than merely understanding the words used. The government must provide adequate assurance that Barrera comprehended the import of the questions Detective Rodriguez asked him, namely, whether Milton Shephard had been in Barrera's home on the evening of July 3 and whether Barrera could recall what he did to the child. *See Holmes v. United States*, 580 A.2d 1259, 1263–64 (D.C.1990) (whether statement made to defendant is adoptive admission depends on whether it is clear defendant unambiguously comprehended the statement). Barrera's answers to questions on cross-examination indicate that he may have attached a different meaning to Detective Rodriguez's questions from the meaning she intended.[17]

As to the third factor, recollection, Detective Rodriguez admitted that she did not write down the precise words of her questions and Barrera's answers. Because the relevant interrogation exchange was very brief, the accuracy of Detective Rodriguez's recollection is critical for determining the reliability of the impeaching statements as reported by the detective. "It seems probable that the reporting of words spoken is subject to special dangers of inaccuracy beyond the fallibility common to all reproduction from memory of matters of observation...." E. CLEARY, McCORMICK ON EVIDENCE § 245 at 727 (3d ed. 1984) (discussing dangers of hearsay); *see also Engel*, 493 A.2d at 1226 (factors bearing on trustworthiness include "duration of time lapse between the event and statement").

Such dangers would be reduced by evidence of the fourth factor: corroboration of the impeaching witness's recollection of the defendant's statement. *See Laumer* 409 A.2d at 200 (corroborating circumstances may indicate statement's trustworthiness); *Engel*, 493 A.2d at 1226 (same). For example, in *Harrison v. United States*, 281 A.2d 222 (D.C.1971), the precise language of a defendant's statement to a police officer was unclear. In concluding that the statement was an admissible confession, this court relied upon the government's evidence that corroborated the police officer's trial testimony regarding the nature of the defendant's statement. *Id.* at 224–25. In contrast, in this case we know from the record that: the police did not use any monitoring device or recording equipment during Barrera's interrogation, no one else was present, and Detective Rodriguez did not take down any contemporaneous notes. Detective Rodriguez, however, did make "substantive" notes of the brief exchange at some point after the interrogation, but it is not clear from the record how long after the interrogation she did so or what exactly she wrote down. In

---

**17.** It is difficult to tell from the transcript whether or not Barrera comprehended Detective Rodriguez's questions, especially since Detective Rodriguez's own testimony as to the specific questions and answers was very brief and not entirely consistent. *See supra* note 8. Barrera also testified that at times the Detective spoke in English and that he could not tell if she was talking to him or to someone else.

many cases the failure to understand every question or the inability to remember verbatim what a suspect says will not make impeaching statements untrustworthy. *See United States v. Rhodes,* 280 U.S.App. D.C. 358, 361, 886 F.2d 375, 378 (1989). But given the illegality and brevity of the interrogation at issue here, I believe the trial court should look closely at these factors.

The underlying rationale for admitting into evidence impeaching statements otherwise excludable is to allow the truthseeking function of a trial to go forward by providing the jury with the means for assessing the defendant's truthfulness. *See Martinez,* 566 A.2d at 1058; *Bourn v. United States,* 567 A.2d at 1315. The final reliability factor, inconsistency, ensures that this is the case. Before allowing the government to impeach a defendant with statements deemed presumptively untrustworthy under the Interpreter Act, a trial court must first determine whether there is a proper foundation for impeachment arising from a discrepancy between the defendant's direct testimony and his or her statements made during the illegal interrogation. *See Ware v. United States,* 579 A.2d at 704. This determination must necessarily take into consideration the other four reliability factors, for if it is not clear whether a defendant comprehended the interrogation questioning, or whether the police interrogator can accurately recall the interrogation exchange, then it may not be clear whether the defendant's statements are contradictions or attempts to commit perjury.

The trial court made an initial determination at the suppression hearing that the statements Barrera made to Detective Rodriguez were voluntary. (As discussed above, voluntariness analysis alone—as one aspect of trustworthiness—fails to satisfy the court's duty under the Interpreter Act.)

After Barrera testified on direct examination, however, the court failed to consider whether or not his testimony in fact contradicted what Detective Rodriguez says he said, and the court did not attempt to determine and/or limit the proper scope of the government's impeachment of Barrera.[18] Because the trial court made no findings with respect to the assumed inconsistency of Barrera's direct testimony and did not have an opportunity to judge the accuracy and reliability of the impeaching statements, I also vote to remand the case for further proceedings but urge the court to apply the suggested reliability factors.

## VI.

Alex Ortiz, a twelve year old friend of Milton Shephard, testified at trial that on the day after the sexual assault Milton told him about it. Defense counsel did not object to this testimony but did file a motion for mistrial at the beginning of the next court day. Defense counsel said she had not objected to Alex's testimony the previous day because she was under the false impression that a hearsay exception for a "delayed report" of sexual assault still existed in this jurisdiction, and that her failure to object was based on representations made to her in private by the prosecutor who tried the case, as well as by "three practitioners" she had consulted in the courthouse corridors.

After reviewing pertinent caselaw, the trial court opined that the reason for the delayed report exception, as a means to satisfy the corroboration requirement in sexual assault cases involving minors, had been eliminated in 1985 with abrogation of the corroboration requirement for sexual assault of a minor. *See supra* Part II. The cases after 1985 are not altogether clear about the effect of this change in the

18. "A statement's internal consistency may ... suggest that it is true." *Engel,* 493 A.2d at 1226. The prosecutor withdrew her request for jury instruction 2.28, "false or inconsistent statement by defendant," stating that she did not think it "appropriate" because Barrera's "statement afterward was not internally inconsistent." *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA 2.28 (3d ed. 1978). We note that the trial court did not instruct the jury on how it was supposed to use the impeaching statements. The standard jury instruction is 1.09, which instructs the jury to consider the impeaching statement "solely for ... consideration in evaluating the credibility of the defendant.... [and] not [to] draw any inference of guilt against the defendant from his alleged statement." *Id.* at 1.09.

law, but on this record we need not address whether there can still be an exception to the hearsay rule for a delayed report of sexual assault. Any possible error here was harmless.

■ First, we uphold the trial court's denial of Barrera's motion for mistrial, both during the trial and at the close of all the evidence. Appellant cites *Alston v. United States*, 462 A.2d 1122, 1128–29 (D.C.1983), in arguing that one cannot say "the admission of this [delayed report] testimony did not substantially sway the judgment of the jury in its deliberations." *Alston*, however, is a pre–1985 case dealing with the excited utterance exception, not with a delayed report. Furthermore, in *Alston*, in contrast with this case, the only competent testimony available at trial was the hearsay testimony. In this case, moreover, defense counsel did not timely object to the hearsay testimony, for whatever reason, and on cross-examination was able to highlight for Barrera's potential benefit inconsistencies between the testimony of Milton Shephard and Alex Ortiz. We therefore conclude that Barrera was not unduly prejudiced by the hearsay testimony in front of the jury, and the trial court did not abuse its discretion in denying the motion for mistrial.

Barrera nonetheless argues that the trial court erred by ignoring his request that there be no jury instruction dealing with the delayed report. We fail to see how such forbearance would have cured the problem of potential juror misuse of the hearsay testimony. While the trial court briefly considered instructing the jury to disregard the testimony completely, at the close of all evidence the court asked each side to submit suggested jury instructions. Defense counsel took the position that no instruction be given, while the prosecutor eventually submitted an instruction to inform the jury that Alex Ortiz's testimony should not be considered for the truth of the matter asserted, but only for the value jurors might attach to the fact that the report was made. Because of a lingering uncertainty about whether a delayed report exception might or might not be permissible on the facts of this case, the trial court adopted the government's recommendation.[19] *See Fitzgerald v. United States*, 443 A.2d 1295, 1304 (D.C.1982) (en banc) (Because "fresh complaint of rape" does not have guarantees of trustworthiness of spontaneous utterance, "the bare fact of the complaint may be introduced only for the purposes of corroboration [and] not for the truth of the matter asserted therein."). Given the circumstances of this case—defense counsel's failure to make a timely objection and counsel's use of Alex Ortiz's testimony to show inconsistencies in Milton Shephard's story—we conclude that the instruction given in no way amounted to reversible error.

## VII.

■ Barrera contends, finally, that he was "substantially prejudiced" by the trial court's decision to allow Barrera's wife's sister-in-law to testify for the government as a rebuttal witness. When cross-examining Barrera's wife, Silvia Salmeron, the prosecutor asked the following questions:

Q: [Your husband is] so important to you that you gave up one of your children to save your marriage, isn't that correct, Ms. Salmeron?

A: I've never given up my children, never renounced my children.

Q: Didn't you give your son Raoul to your sister and told her he was causing too many problems in your marriage?

A: No.

Q: [He has] never gone to live with your sister Natali[a] Salmeron?

---

19. The court instructed the jury as follows:
 Ladies and gentlemen, I forgot to instruct you—a total oversight, but with respect to the testimony of Alex Ortiz, you heard testimony that the complaining witness reported to a friend, Alex Ortiz, that he was sexually assaulted by the Defendant.
 Testimony concerning the complainant's report was not admitted as proof of the facts asserted therein. Evidence that the complaining witness made the report is admitted for whatever significance you may attach to the fact that the report was made.
 You may consider the time the complaining witness made the report, to whom the report was made and any other circumstances surrounding that report you deem relevant.

A: She lived with me.

After the defense rested, the government then called Natalia Salmeron (Silvia Salmeron's sister-in-law) to show Silvia Salmeron's bias. Although counsel may explore a witness's bias with extrinsic evidence, that opportunity "is circumscribed by the rule of relevance and the discretion of the trial court to exclude evidence for a lack thereof." *Gibson v. United States*, 536 A.2d 78, 82 (D.C.1987). The prosecutor proffered that Silvia Salmeron had at one time asked Natalia Salmeron to take Silvia's son, Raoul, away because of "problems" Raoul was having with Barrera. On the stand, however, Natalia Salmeron testified that she had temporarily taken Raoul because of problems with the child, not with Barrera. The trial court correctly ruled that such testimony was not probative of bias, but the court nonetheless admitted Natalia's testimony as evidence of an inconsistent statement to impeach Silvia's testimony that Raoul had never gone to live with Natalia. The prosecutor used that testimony in her closing argument to question Silvia Salmeron's veracity.

█ As a general rule, a party may not present extrinsic evidence to impeach on a collateral issue. *E.g., Durant v. United States*, 551 A.2d 1318, 1326 (D.C.1988); *McClain v. United States*, 460 A.2d 562, 569 (D.C.1983). Because the prior inconsistent statement was about a collateral issue and came in as evidence on a failed attempt to use extrinsic evidence to show bias, it was improper for the court to allow the prosecutor to use Natalia's statement to impeach Silvia. But because Barrera has failed to make a showing of prejudice, and because of the strength of the government's other evidence, we conclude there was no reversible error in the trial court's failure to instruct the jury to disregard the failed rebuttal attempt and to bar the prosecutor's use of those statements in her closing argument.

## VIII.

In sum, we conclude there is no reversible error except, possibly, with respect to the violations of the Interpreter Act, D.C.Code § 31-2702(e). Whether or not those violations rendered Barrera's statements to Detective Rodriguez (as reported at trial) untrustworthy for impeachment purposes under both the Interpreter Act and the *Harris* exception to the *Miranda* exclusionary rule will depend on whether the government can show that those statements are accurate and reliable despite the police department's violation of the Interpreter Act. We therefore remand the case. If the trial court, after considering and applying our discussion in Part IV-B of this opinion, concludes that the statements at issue are inadmissible for impeachment purposes, the trial court without further order from this court shall vacate appellant's conviction and grant a new trial. *See Laumer*, 409 A.2d at 204. If, however, the trial court concludes the impeaching statements are accurate and reliable and thus admissible for impeachment purposes, the record on appeal shall be supplemented by the proceedings undertaken pursuant to this remand, and the case shall be transmitted to this court for further review. *See id.*

*So ordered.*

FARRELL, Associate Judge, with whom SCHWELB, Associate Judge, joins, concurring in all but part V of the opinion and in the result.

My unwillingness to join part V of Judge Ferren's scholarly opinion does not mean I believe the considerations set forth there may not properly guide the judge's rethinking of the voluntariness issue on remand. I am unwilling, however, to prescribe a list of subsidiary findings the judge must or "should" make in deciding the reliability of the defendant's translated statements. The inquiry remains, after all, whether in the totality of the circumstances—including the barriers created by translation into a foreign tongue of the defendant's statements made in Spanish—appellant's statements satisfied basic trustworthiness sufficient to allow their use for the limited purpose of impeachment. That inquiry may be clouded, not assisted, if the judge is told in so many words that he must consider purportedly distinct factors such as "communication" and "comprehension," and specifically should inquire whether the

accused "comprehended the context, meaning, and implications of the police officer's questioning," *ante* at 1133—concepts more vague than clarifying to the trial judge. I also see no justification for this court's discussing application of the factors "in light of the case record to date," *ante* at 1134.. That record may change on remand if the judge decides additional testimony is appropriate; and I am by no means sure I agree with Judge Ferren's application of individual factors—*e.g.*, that Barrera's answers to questions on cross-examination indicate "he may have attached a different meaning to Detective Rodriguez's questions from the meaning she intended," *ante* at 1134. I would avoid any such veiled signal to the trial judge that we are disposed against a finding of reliability on the record so far.