**Kim Long KO, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 93–CF–1322.

District of Columbia Court of Appeals.

Argued Oct. 11, 1996.
Decided May 8, 1997.

Roy W. Krieger, Silver Spring, MD, appointed by the court, for appellant.

Gregg A. Maisel, Assistant United States Attorney, with whom J. Ramsey Johnson, Acting United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and John Armon Beasley, Jr., Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB and REID, Associate Judges, and MACK, Senior Judge.

PER CURIAM.

■ The judgment is affirmed for the reasons stated in the concurring opinion of Judge Schwelb, except that a majority of the

court does not adopt the discussion in Parts III–B. and III–C. (4) of Judge Schwelb's opinion regarding the question whether the trial judge failed to comply with D.C.Code §§ 31–2704, –2711, and –2712 (1993). As to the interpretation of those provisions, the judgment is affirmed for the reasons stated in the concurring opinion of Judge Reid, with whom Judge Mack joins. Specifically, a majority of the court holds that there was error in these respects, but not plain error. Judge Schwelb would hold only that there was no plain error.

*Affirmed.*

SCHWELB, Associate Judge, concurring:

Kim Long (Peter) Ko was convicted by a jury of extortion,[1] threats,[2] and unlawful possession of ammunition.[3] Ko was acquitted of a number of other charges, including kidnapping while armed, two counts of assault with a deadly weapon, possession of a firearm during a crime of violence, and conspiracy. Ko's codefendants, Sun Kin (Sonny) Chan and Wai Kin (Simon) Chow, were found not guilty of all charges.

At the trial, which lasted over three weeks, fourteen different witnesses who used the Cantonese, Mandarin or Fukinese dialects testified through interpreters. Ko's principal contention on appeal is that the interpreters were not properly qualified and that some of them lacked the requisite impartiality. Ko points out, in particular, that several interpreters were paid by the United States Attorney's office, which was prosecuting the case against him. Ko claims that the asserted irregularities with respect to the use of interpreters deprived him of rights protected by the District's Interpreters for Hearing–Impaired and Non–English Speaking Persons Act of 1987 (the "Interpreter Act"), D.C.Code §§ 31–2701 *et seq.* (1993), and by the Constitution of the United States.

Some of the issues presented to us by Ko are serious ones. Almost without exception, however, Ko's contentions are being raised for the first time on appeal. If an appropri-

1. D.C.Code § 22–3851 (1996).

2. D.C.Code § 22–2307 (1996).

3. D.C.Code § 6–2361(3) (1995).

ate and timely objection had been made to the procedures which Ko now assails, any actual or perceived problem could readily have been corrected by the trial judge. Under these circumstances, my colleagues and I have reviewed the actions and procedures complained of for plain error, and we have found none.

## I.

### FACTUAL BACKGROUND

In February, 1992, Ko purchased the Szechuan Restaurant, a well-known Chinatown eatery, from its previous owner, Tony Cheng. Later during that year, Ko accused several employees, including in particular a waiter named Sau Wong Lam, of stealing money from him. Lam and the others vigorously denied these allegations.

According to the prosecution, Ko and persons associated with Ko contrived to force Lam to confess that he was responsible for the theft and to implicate Lam's confederates. Lam was threatened, kicked, beaten, and burned with a hot chafing dish. Lam ultimately signed a written confession, and he admitted to the theft on videotape. Lam also signed a promissory note in which he agreed to pay Ko $20,000. The charges against Ko and his codefendants arose out of their alleged involvement in the mistreatment and coercion of Lam. Ko, as previously indicated, was the only defendant whom the jury convicted of any offense. He filed this timely appeal.

## II.

### THE USE OF INTERPRETERS

It was apparent in advance to all concerned that the trial in this case would require the use of interpreters, and both the

judge and the prosecution made extensive preparations. At the beginning of the trial, prior to jury selection, the judge announced that the government had retained an interpreter for the prosecution witnesses and that the court had appointed two interpreters to assist the defendants. There was no objection from any party to this arrangement. During the course of the trial, a number of perceived or actual problems arose with respect to the performance of the interpreters.

The first issue that arose concerned the identification of the specific dialect that was being used. During the testimony of Tony Cheng, the first Chinese-speaking witness, it was determined that interpretation was being provided to Cheng in Mandarin, rather than in Cantonese. Subsequently, when Sau Wong Lam, the principal complaining witness, was on the witness stand, the defense claimed that although the interpreter was using Mandarin, Lam was answering in Cantonese. On each occasion, the judge conducted a *voir dire* inquiry outside the presence of the jury and established that the questions and the testimony were being properly translated. Counsel were apparently satisfied with the judge's disposition of these problems.[4]

During Lam's testimony, two claims of mistranslation were raised on Ko's behalf. First, Ko's attorney asserted that the interpreter had used the term "music room" when Lam had testified about a "karaoke room." The prosecutor then asked Lam whether there was a particular name for the music room, and Lam responded that "they call it karaoke." Ko also claimed that the interpreter had translated "six days" as "seven days." Ko's counsel subsequently elicited from Lam, on cross-examination, an acknowledgment that the period was in fact six days.[5]

4. At the conclusion of the discussion regarding the interpretation of Tony Cheng's testimony, Ko's attorney stated: "I'm fine.... It's not an issue. I won't pursue it any more."

5. Shortly after Ko's attorney began his cross-examination of Lam, it became apparent that the witness was "saying an awful lot for what we're getting back in English." The judge remarked that the interpreter was waiting until the witness had completed a lengthy narrative and then at-

tempting to translate the entire narrative at once, a task which apparently proved to be difficult. Counsel for one of the codefendants, Chow, requested a new interpreter. Ko's attorney commented that he believed that the previous interpreter "is better than this one," but he did not request a new interpreter or ask for any other relief. The judge resolved the problem by instructing Lam to stop at the end of each sentence and directing the interpreter to interpret one sentence at a time.

While Lam was on the witness stand, the defense accused the interpreters of bias. Ko's attorney reported as follows:

I am told that this translator and the last translator are known friends to Mr. Cheng. Now, I don't know if this is true. I'm just saying, you know, that this is bothering me and they're going crazy here.

In response to this complaint, the judge conducted a *voir dire* examination of all of the interpreters. Each interpreter denied that he had had any social or professional contact with Tony Cheng or with any other person connected with the case. The judge rejected the claims of bias.

Ko's attorney also asserted that during his cross-examination of Lam, an FBI agent walked over to one of the interpreters who was sitting in the courtroom. According to counsel, the agent

talked about what I was doing with the translation. The interpreter shook his head like I was full of bull. And then, when he was finished, the interpreter came over and sat behind the agent and was talking to him and the same thing. Now, that's my observation. And I don't think it's proper. They're supposed to be impartial.

The judge commented that he had been watching the jury "pretty carefully" while Ko's attorney was questioning Lam, and that he could "guarantee" that the jurors were not looking at the interpreter at the time of this alleged incident. Rather, according to the judge, the jurors' attention was focused on the "lively show" which was being put on by Ko's attorney. Although Ko's counsel continued to express outrage and indignation regarding this interpreter's alleged conduct,[6] he did not seek a mistrial or any other relief. On the contrary, counsel stated:

Can I just, in a couple of sentences, quietly put to [rest]—I am not raising an issue like there's some horrible error in this case. I don't think that happened.[7]

As a result of these complaints, which the trial judge characterized as "mostly nonsense," the judge ordered that, from that point forward, the interpreters were not to have contact with anyone connected with the case. The judge commented that, in retrospect, he perhaps should have instituted such ground rules for the interpreters at the beginning of the trial.[8] The judge then advised counsel that he had arranged with the Superior Court's Office of Court Interpreting Services (OCIS) "that the interpreters who are normally utilized by the U.S. Attorney's Office would be, for the purpose of this trial, in essence subcontracted to the court." The judge ordered that the interpreters would now be rotated between the witness stand and the defense table, and that all interpreters—those initially retained by the prosecution, as well as those initially appointed by the court—would interpret both for the witnesses and for the defendants. The purpose of this arrangement, the judge explained, was to avoid the perception by the jury of "any favoritism being shown here [as a result of] certain interpreters working on one team." Counsel for Ko interposed no objection to the new rotation arrangement.

The attorney for one of Ko's codefendants made an oral motion in which he asked the judge to dismiss all of the interpreters because of what counsel characterized as a "strong possibility of bias." In ruling on this motion, the judge addressed the controversy over the interpreters in some detail. After noting that it would be logistically difficult to find, on short notice, new interpreters certi-

---

6. The interpreter did not take kindly to the accusations which Ko's attorney directed against him. He denied any wrongdoing and emphatically stated that he resented counsel's insinuations. Ko's attorney responded that "I object strongly to what he resents or not."

7. The transcript attributes the quoted remarks to counsel for one of Ko's codefendants. As the government points out in its brief, however, it is apparent from the context that Ko's attorney was

speaking. Appellate counsel for Ko has not argued to the contrary.

8. The new arrangement presented logistical problems of its own. The prosecutor pointed out that it was necessary for those interpreters who had been retained by the government to come to the *United States Attorney's Office* each day in order to be paid. The judge stated that these limited contacts would be permitted.

fied in the various Chinese dialects,[9] the judge stated: "I'm not satisfied that any of these interpreters has misperformed in any way." Noting the harsh language which Ko's attorney had exchanged with one of the interpreters, see note 6, *supra*, the judge concluded:

> I think probably [Ko's attorney] in the heat of battle may have read a bit more into the situation than is warranted. I'm satisfied that it's been rectified. I'm also satisfied that [the interpreter] is a professional and he's not going to come back tomorrow determined to mistranslate everything for [Ko] or [for] anybody else. I don't think there's a basis for that. So the request for a new crew is denied.

## III.

## LEGAL DISCUSSION

A. *General principles.*

The principal question presented to us on this appeal is whether, during the course of his trial, Ko was deprived of any right secured by the Interpreter Act or by the Constitution of the United States. This is no trivial issue, for it goes to the essence of a defendant's right to a fair trial. If a defendant who is unable to speak and understand English is compelled to face criminal charges without access to effective translation of the proceedings by a competent and impartial interpreter, then his ability to present a defense may be substantially undermined, and there is "a serious possibility of grave injustice." *State v. Masato Karumai*, 101 Utah 592, 126 P.2d 1047, 1050 (1942). When the accused cannot understand the proceedings, then the trial, to him, is no more than "a babble of voices," *United States ex rel. Negron v. State of New York*, 434 F.2d 386, 388 (2d Cir.1970), and he cannot fairly be said to be present at his own trial. ROSEANN DUENAS GONZALEZ, VICTORIA F. VASQUEZ, & HOLLY MIKKELSON, FUNDAMENTALS OF COURT INTERPRETATION § 3, at 59 (1991).

In *Negron*, writing for a unanimous court, Judge Irving Kaufman described as "nearly self-evident [the] proposition that an indigent defendant who could speak and understand no English would have a right to have his trial proceedings translated so as to permit him to participate effectively in his own defense, provided he made an appropriate request for this aid." *Id.* at 389 (footnote omitted); *accord, People v. Ramos*, 26 N.Y.2d 272, 309 N.Y.S.2d 906, 907–08, 258 N.E.2d 197, 198 (1970). In *United States v. Carrion*, 488 F.2d 12, 14 (1st Cir.1973) (per curiam), *cert. denied*, 416 U.S. 907, 94 S.Ct. 1613, 40 L.Ed.2d 112 (1974), the court concisely synopsized the applicable principles as follows:

> Clearly, the right to confront witnesses would be meaningless if the accused could not understand their testimony, and the effectiveness of cross-examination would be severely hampered.... If the defendant takes the stand in his own behalf, but has an imperfect command of English, there exists the additional danger that he will either misunderstand crucial questions or that the jury will misconstrue crucial responses. The right to an interpreter rests most fundamentally, however, on the notion that no defendant should face the Kafkaesque spectre of an incomprehensible ritual which may terminate in punishment.

(Citations omitted.) Accordingly, "a defendant whose fluency is so impaired that it interferes with his right to confrontation or his capacity, as a witness, to understand or respond to questions has a constitutional right to an interpreter." *United States v. Jong Moon Lim*, 794 F.2d 469, 470 (9th Cir.), *cert. denied*, 479 U.S. 937, 107 S.Ct. 416, 93 L.Ed.2d 367 (1986).

In 1988, in order to vindicate the foregoing rights, the Council of the District of Columbia enacted the Interpreter Act. The purpose of the Act was "to assist hearing-impaired and non-English speaking persons as they participate in proceedings of the

---

9. The judge stated:
 Number one, getting interpreters is not quite like sharpening a pencil.... I don't just go to the shelf and pull off ... six or eight Mandarin and Fukinese interpreters [to be] here tomorrow morning.... [T]o tell me at 5 o'clock in the afternoon that you'd like a new crew in here tomorrow morning is a pipe dream.

D.C. Court System, the Council of the District of Columbia, and the District's Administrative Agencies." COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON GOVERNMENT OPERATIONS, REPORT ON BILL 7–108, at 1 (June 11, 1987) (COMMITTEE REPORT). The statute provides, *inter alia*, that in any criminal prosecution the court shall, upon the request of a "communication-impaired" person,[10] appoint a qualified interpreter to interpret the proceedings for him and to interpret his testimony. D.C.Code § 31–2702(a). The Interpreter Act also establishes an "Office of Interpreter Services" (now the OCIS), which is required, *inter alia*, to establish standards and qualifications for interpreters, to maintain a current list of qualified interpreters, to coordinate requests for interpreters, and to pay for the salaries, fees, expenses and costs incident to providing interpreter services. D.C.Code § 31–2711(b).

In the present case, it is undisputed that the testimony at trial was in fact interpreted for the witnesses and for the defendant. Ko does not claim, nor can he, that he was compelled to go to trial in a language which he did not understand. Rather, Ko challenges the procedures utilized in the trial court to establish the competence of the interpreters, and he claims that some or all of them lacked the requisite impartiality to carry out their responsibilities fairly.

B. *Competence.*

Section 5 of the Interpreter Act provides as follows:

> Before appointing an interpreter, an appointing authority shall make a preliminary determination that the interpreter is able to accurately communicate with and translate information to and from the communication-impaired person involved. If the interpreter is not able to provide effective communication with the commu-

nication-impaired person, the appointing authority shall appoint another qualified interpreter.

D.C.Code § 31–2704. Ko contends that this statute required the trial judge to make a separate on-the-record determination, with respect to each of the fourteen witnesses who testified through an interpreter, that the particular interpreter was able to provide "effective communication" with that witness. So far as the trial record reflects, the judge did not go through such a separate exercise in each instance, and Ko contends that reversal is therefore required.

On the opening day of the trial, the judge advised counsel that the OCIS "has been [busily] working this week to try and line up the requisite expertise." The judge remarked that "we're certainly lucky to be housed in Washington, D.C. because they have contracts with the State Department and they're able to bring in people." He explained that even so, there were not very many qualified interpreters available, especially for an unusual dialect such as Fukinese. Nevertheless, the OCIS had succeeded in obtaining interpreters fluent in Mandarin and Cantonese, and the prosecution had engaged an interpreter fluent in Mandarin and Fukinese. Ko interposed no objection to the use of any of these interpreters,[11] and the other parties were also apparently satisfied.

The record thus reflects that the judge undertook to ascertain, before trial, the kinds of interpretation that would be required at trial. He also endeavored to obtain the most qualified available interpreters to provide that interpretation. Such advance preparation is obviously advisable. A special task force established by the Superior Court to deal with interpreter issues recently pointed out that

> [i]t is inefficient for trial judges to be responsible for the *ad hoc* determination of

---

10. " 'Communication-impaired person' means a person whose hearing is impaired or who does not speak English." D.C.Code § 31–2701(2).

11. The judge specifically inquired about Ko's linguistic capacities and preferences. Ko's attorney responded that

I think I can help you out on Mr. Ko, your Honor. Mr. Ko indicates that he can be sufficiently aware of the proceedings and know what's happening by getting Mandarin interpretation of what's coming from the testimony. If and when he testifies, he'll want translation in Cantonese, so that will be way down the road.

interpreter qualifications in the courtroom, and the results of in-court *voir dire* remain problematic in the best of circumstances. Accordingly, the responsibilities of the Office of Court Interpreting Services include meaningful screening and assessment of interpreters' skills before placing their names on a roster of court interpreters who may be called to interpret on a regular basis in the Court.

COURT INTERPRETATION: A MANUAL FOR JUDICIAL OFFICERS, ATTORNEY[S], INTERPRETERS, AND COURT STAFF IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA (hereinafter MANUAL) § 10.4, at 38 (July 1995).

It appears that at least those interpreters whom the judge initially appointed to assist the defendants were screened by the OCIS and were found to be qualified to interpret in the various dialects which would be required for the trial of the case. I question whether, where the qualifications of the interpreters have been established in this way, the specific omission alleged in this case—the court's technical failure to make a separate determination in the courtroom each time a new witness testified through an interpreter—would, without more, constitute reversible error. The "preliminary determination" required by Section 31–2704 can be effectively made by an OCIS assessment of the interpreter's ability to translate the language or dialect with which the defendant or witness is familiar.

Ko's appeal, however, presents a rather unusual situation. As I have explained at p. 78, *supra,* the interpreters who were initially retained by the United States Attorney's office were effectively "subcontracted" to the OCIS in mid-trial. The record does not reflect whether the OCIS passed on the qualifications of the interpreters retained by the government. There has thus been no "on the record" showing, as to these interpreters, either of effective compliance with Section

31–2704 or of advance certification by the OCIS.

Ko's argument that these circumstances warrant reversal, however, is fatally undermined by his failure to object in any way at trial to the alleged lack of preliminary qualification. It is true that Ko made occasional complaints about actual or perceived errors in interpretation of specific words. He never raised any issue, however, as to the manner in which the interpreters were qualified, nor did he challenge their basic competence [12] in interpreting the testimony. Ko likewise made no objection to the "subcontracting" by the OCIS of the government's interpreters, and there was thus no occasion for the judge to address, on the record, any allegation that those interpreters had not been properly qualified.[13]

Accordingly, as in *Hunter v. United States,* 606 A.2d 139 (D.C.1992), *cert. denied,* 506 U.S. 991, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992),

> the plain error standard applies. *Objections must be made with reasonable specificity; the judge must be fairly apprised as to the question on which he is being asked to rule....* The purpose of requiring a specific objection is to enable the prosecution to respond to any contentions raised and to make it possible for the trial judge to correct the situation without jettisoning the trial.... Litigants should not be permitted to keep some of their objections in their hip pockets and to disclose them only to the appellate tribunal; [o]ne cannot take his chance on a favorable verdict, reserving a right to impeach it if it happens to go the other way.

*Id.* at 144 (emphasis added; citations and internal quotation marks omitted).

In *Redman v. United States,* 616 A.2d 336 (D.C.1992), a case quite similar to this one, the defendant argued for the first time on appeal that the interpreter appointed by the

---

12. I deal separately with Ko's allegations of bias on the part of the interpreters. See part III–C., *infra.*

13. I have no doubt that the judge had the obligation to assure, directly or through OCIS, that the government's interpreters possessed the necessary qualifications. As a result of the failure of

defense counsel to raise the issue, however, the record does not disclose what steps, if any, were taken by the court in this regard. Without making an adequate record, Ko cannot show that error occurred. *See Cobb v. Standard Drug Co.,* 453 A.2d 110, 111 (D.C.1982).

court to assist him had not been properly qualified in conformity with Section 31–2704. This court held that the challenge came too late:

> Only if the defendant makes any difficulty with the interpreter known to the court can the judge take corrective measures. *To allow a defendant to remain silent throughout the trial and then, upon being found guilty, to assert a claim of inadequate translation would be an open invitation to abuse.*

*Id.* at 338 (quoting *Valladares v. United States,* 871 F.2d 1564, 1566 (11th Cir.1989)) (emphasis added in *Redman*).[14] Noting that the "plain error" standard applied, this court concluded in *Redman* that the defendant had failed to show that plain error had occurred. *Id.*

In all relevant respects, this case is like *Redman*.[15] In order to prevail under the "plain error" standard, Ko must establish first, that the error was "plain" or "obvious," and second, that reversal of his conviction is required in order to avoid a miscarriage of justice. *See United States v. Olano,* 507 U.S. 725, 731–35, 113 S.Ct. 1770, 1776–78, 123 L.Ed.2d 508 (1993); *Foote v. United States,*

670 A.2d 366, 369 (D.C.1996). Even if we were to assume, on a somewhat sketchy record, that the judge's failure to qualify interpreters in the courtroom, and to match them with the witnesses, was error, the procedure used by him was not shown to be "obviously" deficient. Moreover, the plain error standard can be satisfied only if the error in question "compromised the fairness or integrity of the entire trial or threatened . . . a clear miscarriage of justice." *Hunter, supra,* 606 A.2d at 146. Ko has not made such a showing.

The only specific errors in interpretation alleged to have occurred during the entire trial were comparatively minor and were promptly resolved. See pp. 77–78, *supra.* Notwithstanding heated exchanges as to one interpreter's alleged partiality, most of the translation proceeded smoothly. Two of the three defendants were acquitted, and Ko himself was found not guilty of the most serious charges against him. Any noncompliance with Section 31–2704 could readily have been corrected if counsel had interposed a contemporaneous objection. Viewing the record as a whole, this is not the stuff of which reversals for plain error are made.[16]

14. The New York Court of Appeals has likewise required a contemporaneous objection to the failure to provide the defendant with an interpreter because:

> Otherwise, it would be possible for a defendant to remain silent throughout the trial, and take a chance of a favorable verdict—failing in which, he could secure a new trial upon the ground that he did not understand the language in which the testimony was given. The absurdity of such a proposition is self-evident.

*Ramos, supra,* 309 N.Y.S.2d at 908, 258 N.E.2d at 198–99.

15. Although Ko, unlike the defendant in *Redman,* made sporadic complaints at trial about the performance of the interpreters, he never asserted with "sufficient precision," *Hunter, supra,* 606 A.2d at 144, or indeed at all, that the preliminary qualification of the interpreters was not accomplished in the manner required by the Interpreter Act.

16. Although neither party has addressed the provision, we note that Section 7 of the Interpreter Act reads as follows:

> § 31–2706. Waiver.
> (a) A communication-impaired person entitled to the services of an interpreter under this chapter may waive the services of a qualified

interpreter in whole or in part. The waiver must be made in writing, or orally on the record, by the communication-impaired person following consultation with that person's attorney. If the person does not have an attorney, the waiver must be made in writing by the communication-impaired person in that person's written language and the waiver must be approved in writing, by the appointing authority.

> (b) A communication-impaired person who has waived an interpreter under this section may provide his or her own interpreter at his or her own expense, without regard to whether the interpreter is qualified under this chapter.

Ko has not contended that Section 31–2706 affects the applicability of the plain error rule, and my colleagues and I agree that we should defer any further exploration of the effect of this part of the Interpreter Act until we are confronted with an appeal in which counsel choose to rely on it. We note that the federal interpreter statute contains a comparable waiver provision, *see* 28 U.S.C. § 1827(f)(1) & (2), but that federal appellate courts nevertheless require contemporaneous objections. *See, e.g., United States v. Huang,* 960 F.2d 1128, 1135–36 (2d Cir.1992) (applying plain error standard); *Valladares, supra,* 871 F.2d at 1566.

## C. Lack of impartiality.

### (1) The contentions of the parties.

Ko also contends that his convictions should be reversed because the interpreters were biased against him, or because they at least lacked the impartiality and appearance of impartiality which the law should require of them. He claims primarily that payment by the United States Attorney's office of the interpreters' salaries and costs "convert[ed] the interpreters from the experts of the court into the experts of the Government, conveying pernicious incentive to please their new partisan master." According to Ko, the "[r]esulting alignment with and loyalty to the position advocated by the Government is inevitable." [17] Ko asserts that the prosecutor's payment of the interpreters' fees was proscribed by the Interpreter Act, violated the bedrock constitutional principle of "separation of powers" between the executive and judicial branches, and deprived Ko of his liberty without due process of law.

The government responds that the interpreters retained and paid by the United States Attorney's office were not appointed under the Interpreter Act at all, and that the Act has no application to them. The government further argues that Ko interposed no objection in the trial court to the payment arrangements of which he now complains, and that he has not shown plain error.

### (2) Ko's constitutional contentions.

■ Before addressing the more difficult statutory issues which Ko has presented to us, I turn briefly to his constitutional arguments. I conclude, and my colleagues agree, that Ko has not preserved these contentions for appeal and that, in any event, they are lacking in merit.

■ Ko did not raise any constitutional issue in the trial court, and the decision whether to entertain his constitutional arguments on appeal is entirely discretionary. *In re S.K.,* 564 A.2d 1382, 1384 n. 2 (D.C.1989) (per curiam) (citations omitted). This court ordinarily declines to consider constitutional

contentions which are being presented for the first time on appeal unless the alleged constitutional shortcoming in the proceedings was so plain that the judge should have ruled on it notwithstanding the litigant's failure to raise it. *Id.*

■ There was no such "obvious" constitutional defect here. We have stated that "a qualified interpreter must be neutral and detached." *Barrera v. United States,* 599 A.2d 1119, 1130–31 n. 13 (D.C.1991). As the Supreme Court of New Jersey explained in *State in the Interest of R.R. Jr.,* 79 N.J. 97, 398 A.2d 76, 86 (1979), an interpreter should be

> an individual who has no interest in the outcome of the case. This is so because the danger that a primary witness' message will be distorted through interpretation is compounded when the interpreter is biased one way or the other.

Notwithstanding the need to assure impartiality, however, the courts have declined to adopt a *per se* rule disqualifying an employee or "servant" of the government from interpreting for the defendant. *See, e.g., Chee v. United States,* 449 F.2d 747, 748 (9th Cir. 1971); *United States v. Holton,* 227 F.2d 886, 897 (7th Cir.1955); Charles C. Marvel, Annotation, *Disqualification, for Bias, of One Offered as Interpreter of Testimony,* 6 A.L.R.4th 158, 175–77 (1981 & Supp.1996); Thomas M. Fleming, Annotation, *Right of Accused to Have Evidence or Court Proceedings Interpreted, Because Accused or Other Participant in Proceeding Is Not Proficient in the Language Used,* 32 A.L.R. 5th 149, 451–62 (1995 & Supp.1996).

■ Decisions respecting the appointment of interpreters are confided to the sound discretion of the trial judge. *In re Q.L.J.,* 458 A.2d 30, 31–32 (D.C.1982) (per curiam). That discretion has been held to extend to the determination whether a law enforcement officer may be designated as the defendant's interpreter. *See, e.g., State v. Cimini,* 53 Wash. 268, 101 P. 891 (1909); *La Count v. State,* 237 Ga. 181, 227 S.E.2d 31, 33 (1976),

---

**17.** A less abrasive statement of Ko's argument might be that he who pays the piper calls the tune.

*cert. denied,* 429 U.S. 1046, 97 S.Ct. 753, 50 L.Ed.2d 761 (1977); *State v. Coria,* 39 Or. App. 507, 592 P.2d 1057, 1059, *review denied,* 286 Or. 449 (1979).[18] If a "pernicious incentive" to assist the prosecution cannot be automatically attributed even to a police officer, then the fact that interpreters in this case were paid by the United States Attorney's office, standing alone, did not render them constitutionally ineligible. Accordingly, there was no violation of Ko's constitutional rights, either under the doctrine of separation of powers or under the Due Process Clause.

(3) *The applicability of the Interpreter Act.*

 Section 3 (a) of the Interpreter Act provides, *inter alia,* that "the [court] shall appoint a qualified interpreter upon the request of the communication-impaired person." D.C.Code § 31–2702(a). The government argues that those interpreters whose salaries it paid were retained for the purpose of interpreting the testimony of prosecution witnesses, and that they therefore were not appointed "upon the request of the communication-impaired person." Accordingly, says the government, these individuals were not subject to the provisions of the Interpreter Act specifying that interpreters appointed under the Act are to be paid by the Interpreter Office. *See* D.C.Code §§ 31–2711(b)(6), –2712(b).

The government's argument, however, cannot be reconciled with the factual scenario that actually developed in this case. The interpreters sponsored by the government were eventually "subcontracted" during the trial to the OCIS. They were then rotated with the interpreters who had initially been appointed by the court. As a result, they were called upon to interpret for the defendants, including Ko, and their responsibilities were indistinguishable from the duties of those interpreters whom the judge had appointed to interpret for the defense.

Moreover, and more fundamentally:

There are two basic reasons for having an interpreter present in a court case—to enable the defendant to understand the proceedings, and to enable the court to understand all non-English speakers who address the court. Therefore, the interpreter's "clients" are all of the protagonists in the court proceeding; the defendant and defense counsel, the prosecution, the judge, the clerk and other court personnel, and all witnesses who testify. No matter for whom interpreters are interpreting at a given moment, they are officers of the court, neutral participants in the process. *They are not part of the defense "team" if they are interpreting for the defendant, or part of the prosecution "team" if they are interpreting for prosecution witnesses.* This is an aspect often misunderstood by interpreters who report being influenced by the social environment.

MANUAL, Appendix C, *Ethical Principles and Standards,* at 22. (Emphasis added.) On this record, we conclude that the Interpreter Act applied to all of the interpreters, including those whose salaries and costs were paid by the United States Attorney's office.

(4) *Ko's statutory contentions.*

Section 13 (b) of the Interpreter Act provides as follows:

The salaries, fees, expenses and costs incident to providing the services of interpreters under this chapter shall be paid for by the Office [of Interpreter Services].

D.C.Code § 31–2712(b); *see also* the virtually identical language in Section 31–2711(b)(6). These provisions, read literally, appear to proscribe the payment by the United States Attorney's office of the salaries, fees, expenses and costs of interpreters who have

---

**18.** We stated in *Barrera,* citing the COMMITTEE REPORT, that in the context of station-house questioning following a defendant's arrest, "an *interrogating* police officer, even one fluent in the native language of the suspect, cannot be a qualified interpreter" 599 A.2d at 1130–1131, n. 13 (emphasis added), because such an officer would not be sufficiently detached and impartial. *Ac-cord, Gonzales v. State,* 372 A.2d 191, 192–93 (Del.1977); *Bielich v. State,* 189 Ind. 127, 126 N.E. 220, 223 (1920). We explicitly declined in *Barrera,* however, to foreclose the possibility that a police officer unconnected with the case could become a qualified interpreter. 599 A.2d at 1130 n. 12, 1131 n. 13.

been appointed pursuant to the provisions of the Act.

Judge Learned Hand warned years ago, however, that we should not make "a fortress out of the dictionary." *See Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945). It is not at all obvious to me[19] that the provisions on which Ko relies were designed to deal with the situation here presented. There is nothing in the legislative history of the Interpreter Act to suggest that the payment of interpreters' salaries and fees by the prosecutive arm of the government was any part of the mischief which the Interpreter Act was designed to correct. Rather, Sections 31–2712(b) and 31–2711(b)(6) may simply have been designed to provide by legislation for a source of payment.

Rule 28 (b) of the Superior Court's Rules of Criminal Procedure provides:

*Interpreters.* The Court may appoint an interpreter of its own selection and may fix the reasonable compensation of such interpreter. Such compensation shall be paid out of [the] funds provided by law *or by the government,* as the Court may direct.

(Emphasis added.) Rule 28(b) has been in effect since 1971, when the then newly-created Superior Court first adopted Rules of Criminal Procedure. It is substantially identical to what is now Rule 28 of the Federal Rules of Criminal Procedure, which has been in effect since 1966. Both federal and District of Columbia law have thus authorized payment of interpreters' salaries by "the government" for many years. If the members of the Council intended to overrule or repeal a long-standing practice which has been codified in the rules of the Superior Court, one might reasonably expect them to do so expressly, rather than *sub silentio* without even mentioning the problem. Indeed, there is no indication from any source that payment by

any branch of the government of the salaries and fees of interpreters was perceived to be a problem at all.[20]

The government also relies on Section 31–2711(d), which authorizes the Office of Interpreter Services to contract for and compensate qualified interpreters. That section provides, *inter alia,* that the Office may "employ interpreters on a full-time or part-time basis, use qualified volunteer services, or procure the services *in any other method consistent with the District of Columbia law.*" *Id.* (Emphasis added.) According to the government,

[c]ertainly, one lawful—and fiscally prudent—means of paying for interpreter services was to allow the U.S. Attorney's Office to provide the funds for the services of those interpreters required for the government's witnesses in criminal prosecutions. This interpretation of § 31–2711(d) is consistent with Rule 28, which allows a trial court to pay for appointed interpreters "out of the funds provided by law or by the government, as the Court may direct."

I do not suggest that the government's contentions summarized above are necessarily compelling. "The words of a statute should be construed according to their ordinary sense, and with the meaning commonly attributed to them." *J. Parreco & Son v. District of Columbia Rental Hous. Comm'n,* 567 A.2d 43, 46 (D.C.1989). The intent of the legislature is ordinarily to be found in the language which it has used. *Id.* At least to the extent that the government asks us to treat the phrase "any other method consistent with District of Columbia law" as trumping ostensibly clear statutory language requiring payment by the Office of Interpreting Services, it may be treading on treacherous ground.

**19.** My colleagues' contrary views on this issue are set forth in Judge Reid's opinion.

**20.** The Federal Court Interpreters Act (FCIA), provides, with an exception not here applicable, that "salaries, fees, expenses and costs that are incurred with respect to Government witnesses ... shall ... be paid by the Attorney General from sums appropriated to the Department of Justice." See 28 U.S.C. § 1827(g)(3). Congress

was presumably aware that, by interpreting the testimony of prosecution witnesses, the interpreters would also be translating for the jury and, in some instances, for the defendant. Congress thus evidently perceived no conflict of interest in an arrangement under which interpreters whose words were heard by jurors and defendants were paid by the prosecutive arm of the government.

Taking the case as it comes to us, however, the question on appeal is not whether an interpreter paid by the United States Attorney's office may properly be designated to interpret for the defendant over the defendant's objection. Rather, the court must decide whether the assignment to Ko of interpreters retained and paid by the prosecution was so obviously erroneous and so manifestly unjust that the judge committed plain error in taking the actions that he did. If Ko had expressed any dissatisfaction with the rotation to him of these interpreters, the judge might well have reconsidered his decision and found some alternative resolution. Courts require a contemporaneous objection in order to enable the judge to deal with problems of this kind at the trial court level without jettisoning the trial. *See Hunter, supra,* 606 A.2d at 144. If, as in this case, a party fails to object, then he is faced on appeal with the formidable task of demonstrating plain error.

In relation to his claims of bias, Ko has satisfied *neither prong* of the plain error standard. Especially in light of the provisions of Rule 28(b), the use of the government-paid interpreters, while questionable, was not "plainly" or "obviously" impermissible. Moreover, there was no clear miscarriage of justice in this case. Ko has made no showing whatever of actual bias in translation, or of any prejudice to him resulting from the prosecutor's payment of the interpreters' salaries.[21]

## IV.

## CONCLUSION

■ For the foregoing reasons, Ko's convictions must be affirmed.[22]

---

**21.** Ko's attorney claims in his brief that the interpreters' "lack of objectivity existed not merely in the abstract, but was manifest." He focuses largely on the incident in which, according to Ko's appellate counsel, one interpreter "openly cavorted with an FBI or other government agent in the presence of the jury.... Jurors could easily infer that the prejudicial reaction of the interpreter to a witness or party is the equivalent of a similar reaction by the judge."

If the facts were as Ko's counsel retrospectively describes them, then he would surely have a point. "It is very important that the interpreter maintain a degree of professional distance with all persons involved in a case in order to avoid any appearance of impropriety.... Personal conversations between interpreter and parties or witnesses are inappropriate as they may be misconstrued and bring the interpreter's neutrality into question." MANUAL, § 10.11, at 68–69. Ko correctly asserts that conduct on the part of an interpreter which conveys to the jury his disagreement with a party's testimony or contentions would be altogether intolerable.

The trial judge, however, plainly recognized the force of these concerns. Upon learning of the alleged improper conduct, he issued an appropriate directive to the interpreters and to counsel. Significantly, moreover, the judge firmly and explicitly rejected defense counsel's assessment of what had occurred. The judge specifically found that the jurors had not seen the incident which precipitated Ko's attorney's complaint. He also rejected as overblown defense counsel's allegations regarding the accused interpreter's conduct, and he found that the interpreters had performed satisfactorily.

The judge was there. My colleagues and I were not. We have no basis whatever, on this record, for second-guessing the judge's assessment. In my judgment, the trial judge dealt effectively and impartially with a rather volatile contretemps. Ko has failed to demonstrate any abuse of discretion.

**22.** Ko's remaining contentions on appeal do not require plenary consideration.

Ko claims that the police intimidated two of his witnesses. When the issue arose at trial, however, his counsel did not move for a mistrial, nor did he request an evidentiary hearing on his claims. Instead, he elected to present testimony about the alleged intimidation to the jury, in an effort to undermine the government's case. Under these circumstances, Ko has not preserved the issue for appeal, nor has he shown that the trial judge's failure, *sua sponte,* to take some unspecified corrective action, not requested below, amounted to plain error. *See Olano, supra,* 507 U.S. at 731–35, 113 S.Ct. at 1776–78.

Ko next asserts that the prosecution violated his rights under *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), by allegedly inducing a prosecution witness to discuss the case with Ko outside the presence of Ko's attorney. When this issue was raised at trial, the judge declined to rule on it without a relevant evidentiary record. The judge stated instead that if Ko were convicted, defense counsel could file an appropriate post-trial motion to which the government could then respond, so that the allegations could be resolved in an orderly manner. Ko's attorney interposed no objection to this procedure, but no post-trial motion was filed. No meaningful record on the issue is before us, and Ko therefore has not preserved the point for appeal. Moreover, the evidence of any *Massiah* violation is entirely speculative.

Ko claims for the first time on appeal that Count 5 of the indictment, which charged Ko

REID, Associate Judge, with whom MACK, Senior Judge, joins, concurring:

We concur in the judgment of affirmance in this difficult matter. On the record before us, we believe the trial judge managed to resolve complex interpretation issues without compromising minimal requirements of fundamental fairness, as reflected in the Interpreter Act. Defense counsel both acquiesced in the trial court's solutions to a complicated problem and failed to object to procedures for payment of interpreters retained initially by the United States Attorney's office. However, we disagree with Judge Schwelb's interpretation of D.C.Code §§ 31–2704, –2711, and –2712 (1996).

When Ko's trial began, there were two sets of interpreters. One set had been retained by the United States Attorney's office to provide interpreter services for government witnesses. The other set had been appointed by the trial court. In mid-trial, and after questions had been raised about the impartiality of the government's interpreters, the trial court decided that it should enter into a subcontract with the government's interpreters. However, these interpreters continued to be paid directly by the United States Attorney's office, and were required to report daily to that office as a condition of payment. The record before us does not reveal that the qualifications of the government interpreters were reviewed either before the commencement of Ko's trial, or when the trial court decided to execute a subcontract with them. In our view, these procedures and arrangements, allowing initially for the hiring of interpreters by the United States Attorney's office to perform in-court interpreter services, and direct payment of these interpreters by the United States Attorney's office, violated the Interpreter Act.

First, we believe § 31–2704 required all interpreters in this matter to be appointed by the court. Section 31–2702(a) provides in pertinent part, "[t]he appointing authority shall appoint a qualified interpreter upon the request of the communication-impaired person," defined in part under § 31–2701(2) as "a person ... who does not speak English." Section 31–2701(1) defines "appointing authority" as "the presiding judge of any court of the District of Columbia, the chairperson of any District of Columbia board or commission, the director or commissioner of any department or agency of the District of Columbia, the chairman of the Council of the District of Columbia or the chairperson of any committee of the Council of the District of Columbia conducting a hearing, or any other person presiding at any hearing or other proceeding in which a qualified interpreter is required...." The list of appointing authorities does not include the United

with threatening both Sau Wong Lam and Ji Ying Mei, was duplicitous. By failing to assert the claim of duplicity at trial, Ko waived it. *See, e.g., Nichols v. United States,* 343 A.2d 336, 340–41 (D.C.1975). The judge did not "constructively amend" the indictment by providing the jury with a supplemental verdict form which dealt appropriately with any unanimity problem.

Ko asserts that there was insufficient evidence to support his conviction of unlawful possession of unregistered ammunition. Ko himself testified, however, that after he found in his office ammunition allegedly owned by Tony Cheng, he placed the ammunition in his desk drawer but made no attempt for several months to return the ammunition to Cheng. There was also testimony that Ko threatened Lam with a pistol. Viewed in the light most favorable to the prosecution, the evidence was sufficient. *See Bernard v. United States,* 575 A.2d 1191, 1192 (D.C.1990).

Ko presents two other contentions related to his unregistered ammunition conviction, but neither requires reversal. First, contrary to Ko's position, the trial judge did not commit plain error by failing to intervene, *sua sponte,* in the absence of any objection, after a prosecution witness described the ammunition as "live". Similarly, the judge's failure to take any action on his own initiative when the prosecutor alluded to Ko's parole status was not "plain error"; the fact that Ko was on parole had been brought out by defense counsel, and it was arguably relevant to Ko's claim that he had "forgotten" about the ammunition. *See Irick v. United States,* 565 A.2d 26, 31 (D.C.1989).

Finally, the trial judge did not abuse his broad discretion by permitting Dr. Larry Hammack to testify as a rebuttal witness, *see Fitzhugh v. United States,* 415 A.2d 548, 551 (D.C.1980), or by admitting, over a hearsay objection, the testimony of prosecution witness Tun Cung Yam that his daughter asked Yam to deliver a check to Ko's sister. *See Burgess v. United States,* 608 A.2d 733, 740 (D.C.1992); *United States v. Shepherd,* 739 F.2d 510, 514 (10th Cir.1984) ("An order or instruction is, by its nature, neither true nor false and thus cannot be offered for its truth.")

States Attorney or his agents. Hence, in our view, allowing the United States Attorney's office to bring its own interpreters to court to perform in-court interpreter services constitutes a violation of the plain words of the Interpreter Act.

■ Second, § 31–2704 requires the appointing authority, prior to appointment, to "make a preliminary determination that the interpreter is able to accurately communicate with and translate information to and from the communication-impaired person involved." Here, the record does not reflect that the trial court carried out this statutory mandate either before the government's interpreters began to render service, or when the trial court decided to enter into a subcontract with the government's interpreters. Nor was there any certification from the Office of Interpreter Services that the government's interpreters were qualified for the task of translating various Chinese dialects.

■ Third, under the Interpreter Act, all interpreters are required to be paid by the Office of Interpreter Services. Section 31–2711(b)(6) states, clearly, "[t]he Office [of Interpreter Services] shall pay for the salaries, fees, expenses, and costs incident to providing interpreter services as set forth in § 31–2712." Section 31–2712(b) repeats this mandate, "[t]he salaries, fees, expenses, and costs incident to providing the services of interpreters under this chapter shall be paid by the Office." Thus, the statutory command is that the Office of Interpreter Services must pay the interpreters. The arrangement here under which the United States Attorney's office paid the salaries of interpreters initially retained by that office, and later subcontracted for by the trial court, was fundamentally at odds with the statutory mandate. Direct payment by the United States Attorney's office of interpreters who were required to make daily trips to the United States Attorney's office in connection with their pay, gives the appearance of par-

tiality. The government's interpreters knew that their salaries would be paid by the United States Attorney's office. This arrangement raised the specter of allegiance and loyalty to the United States Attorney's office as payroll officer, rather than to the court as a later subcontracting agent. To the extent that Super. Ct.Crim. R. 28(b) permits the United States Attorney's office to pay interpreters directly, it conflicts with §§ 31–2711 and –2712 of the Interpreter Act, which assigns that duty to the Office of Interpreter Services, and is invalid.[23]

At the outset of his legal discussion, Judge Schwelb writes,

If a defendant who is unable to speak and understand English is compelled to face criminal charges without access to effective translation of the proceedings by a competent and impartial interpreter, then his ability to present a defense may be substantially undermined, and there is "a serious possibility of grave injustice." *State v. Masato Karumai*, 101 Utah 592, 126 P.2d 1047, 1050 (Utah 1942).

We fully agree with the wisdom embedded in this quotation. The emphasis is placed on a "competent and impartial interpreter." In our view, the plain language of the Interpreter Act requires both competent and impartial interpreters. The Office of Interpreter Services is assigned a major role to ensure competency and impartiality of interpreters. It is assigned responsibility for formulating and applying "reasonable standards for evaluating the credentials and qualifications of persons who may serve as qualified interpreters in bilingual proceedings" by considering "such factors as education, training, experience, demonstrated current competence, and certification by a recognized private, federal, or state registry, board, or other organization that is determined by the Office to possess a sufficient level of competence, training, testing, and certification of interpreters in the particular language specialty of the interpreter." Section 31–2711(b)(1).

---

**23.** Rule 28(b) provides, "Interpreters. The Court may appoint an interpreter of its own selection and may fix the reasonable compensation of such interpreter. Such compensation shall be paid out of funds provided by law or by the government, as the Court may direct." We express no view as to whether the Interpreter Act would permit the United States Attorney's office to pay a sum of money directly to the Office of Interpreter Services to be used for the payment of interpreters by the Office of Interpreter Services.

It is also assigned the duty of issuing "rules that prescribe a schedule of reasonable fees for services rendered by interpreters" as well as establishing "rules governing the method of payment." Section 31–2711(b)(5).

Unless trial judges carry out the mandate of a preliminary determination of an interpreter's qualifications under § 31–2704; and unless the payment scheme, set forth in §§ 31–2711 and –2712 to ensure impartiality, is adhered to rigorously, a defendant may be denied his statutory right to a competent and impartial interpreter. Accordingly, for the foregoing reasons we concur in the judgment in this matter, but disagree with Judge Schwelb's interpretation of D.C.Code §§ 31–2704, –2711 and –2712.

Before FERREN and SCHWELB, Associate Judges, and MACK, Senior Judge.